# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TRACY KAISER,

     **Plaintiff,**

                            **Civil Action 2:18-cv-414**
                            **Chief Judge Edmund A. Sargus, Jr.**
     **v.**                      **Magistrate Judge Chelsey M. Vascura**

COMMISSIONER OF SOCIAL SECURITY,

     **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Tracy Kaiser ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 19), Plaintiff's Reply (ECF No. 20), and the administrative record (ECF No. 8). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her application for disability insurance benefits on December 20, 2013. (R. at 248-249.) Plaintiff's application was denied initially and upon reconsideration. (R. at 153-161, 162-168.) Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Jeannine Lesperance (the "ALJ") held a hearing on October 17, 2016,

at which Plaintiff, represented by counsel, appeared and testified.  (R. at 37-83.)  On February 8,

2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the

Social Security Act.  (R. at 12-36.)  On March 9, 2018, the Appeals Council denied Plaintiff's

request for review and affirmed the ALJ's decision.  (R. at 1.)  Plaintiff timely filed this action

for review.  (ECF No. 1.)

Plaintiff advances four errors in her Statement of Errors.  Specifically, Plaintiff asserts

that remand is required because the ALJ (1) erred in finding that she had no severe physical

impairment for right arm peripheral artery disease ("PAD"); (2) improperly relied on her

activities of daily living in finding that she is not disabled; (3) erred in failing to appropriately

consider her "leg weakness and leg numbness with her leg giving out" in determining her

residual functional capacity ("RFC")[1]; and (4) erred in relying on the vocational expert's

testimony to conclude that there were jobs in the national economy that Plaintiff could have

performed despite the limitation that Plaintiff never interact with the general public.  The

undersigned limits her discussion to evidence bearing on these contentions of error.

## II.    RELEVANT RECORD EVIDENCE

### A.    Relevant Medical Evidence

Plaintiff has reported leg and foot pain or tingling on and off over the years.  For

example, on September 24, 2012, Plaintiff visited her general practitioner, Dr. Kristina M.

Lehman, with complaints of "mostly left foot" pain and "tingling from toes to ankle."  (R. at

720.)  Plaintiff also reported that her "[c]alves are cramping."  (*Id.*)  Dr. Lehman noted that

---

[1] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations."
20 C.F.R. § 404.1545(a)(1).

Plaintiff was taking tramadol for pain, which Plaintiff reported at first "helped more but not as much now." (*Id.*) Dr. Lehman continued Plaintiff on medications to control the pain.

A little over three months later, on January 7, 2013, Plaintiff saw Dr. Lehman again complaining of shooting pain from the left hip into the leg. (R. at 755.) Dr. Lehman noted that Plaintiff was in no distress and continued Plaintiff on pain medications.

Plaintiff saw Dr. Lehman again on February 21, 2013, for right hand numbness, with no complaints of leg or foot pain. (R. at 763.) Dr. Lehman noted that Plaintiff was not in distress. Roughly a year later, on February 10, 2014, Plaintiff saw Dr. Lehman again, who noted that Plaintiff "[a]mbulates without difficulty." (R. at 911.) Plaintiff visited Michael L. Anthony, DPM, on April 25, 2014, with complaints of foot pain. Dr. Anthony noted that Plaintiff "presents ambulating with a normal gait." (R. at 1008.) Dr. Anthony performed an examination of Plaintiff's lower extremities and concluded Plaintiff's foot pain was secondary to Type 2 diabetes. On examination, Plaintiff exhibited normal range of motion, sensation and strength in both feet. (R. at 1008.)

In August 2014, Plaintiff was observed to have developed peripheral artery disease ("PAD")[2] of the right arm. (R. at 1141, 1186-87.) Shortly after the diagnosis, Dr. Patrick S. Vaccaro, a vascular surgeon, examined Plaintiff on August 19, 2014, and recommended she undergo an angioplasty and stenting for this condition. (R. at 1186-1188.) On September 5, 2014, Dr. Vaccaro completed an opinion evaluation questionnaire, and when asked to "describe any limitations [Plaintiff's] impairment(s) imposes on the ability to perform sustained work

---

[2] Peripheral artery disease of the arm is a circulatory disorder in which the arteries in the arm become narrow or blocked, unable to carry oxygen-rich blood into the affected arm.

activity," Dr. Vaccaro responded, "N/A." (R. at 1185.)

Plaintiff underwent an angioplasty and stenting to treat the PAD on September 15, 2014. (R. at 1205-09.) The procedure was performed by Dr. Jean E. Starr. Plaintiff followed up with Dr. Starr on September 24, 2014, at which time Dr. Starr noted Plaintiff had "[m]oderate pain after procedure that is improving," and that Plaintiff was "doing well." (R. at 1216.)

Plaintiff visited Dr. Lehman the following month, on October 8, 2014, with reports of memory loss and headaches. (R. at 1237.) Dr. Lehman reported that "[w]ith onset being just after invasive cardiology procedure[,] the differential [diagnosis] must include CVA" to rule out stroke or intracranial lesion as possible complications of the stenting procedure. (R. at 1239.) An MRI was later performed, which revealed no evidence of a stroke or intracranial lesion. (R. at 1240.)

Plaintiff saw Dr. Starr again on October 16, 2014, roughly one week after complaining to Dr. Lehman of memory loss and headaches, at which time Dr. Starr noted that Plaintiff "denies any post-op problems" stemming from her September 14, 2014 angioplasty and stenting. (R. at 1241.) Plaintiff reported at that time that "[h]er [right] arm is significantly better." (R. at 1241.) Dr. Starr further noted that Plaintiff was making "adequate progress" following the September 15, 2014 procedure. (R. at 1241.)

On October 10, 2014, Maria Congbalay, M.D., a State agency medical consultant, reviewed Plaintiff's file on Reconsideration. Dr. Gongbalay opined that Plaintiff retained the residual functional capacity to perform light work with the restrictions set forth in the RFC the ALJ ultimately assessed. (R. at 143-145)

**B.      Relevant Hearing Testimony**

**1.      Plaintiff's Testimony**

At the October 17, 2016 hearing before the ALJ, Plaintiff testified that she experiences

pain "down my left side, and . . . kind of into my upper leg."  (R. at 63.)  Plaintiff further testified

that she would frequently "just fall."  (R. at 61.)  When asked by her counsel to describe her

falls, Plaintiff stated: "I'm just going along, and it's like all of a sudden my heart just takes off . .

. [a]nd I don't want to call it a pass out as much, because I still hear everything . . . [i]t's just like

everything goes white, and I lose track of where I am in space and time, and I fall."  (R. at 64.)

Plaintiff stated that these episodes can happen several times a day.  (*Id.*)  Plaintiff admitted,

however, that she does not use a cane, walker, or other assistive device to avoid falls.  (R. at 62.)

When asked by the ALJ if she has discussed the falls with her general practitioner, Plaintiff

stated, "We've talked about it," but "I'm kind of not going for it right at the moment, until it's an

absolute."  (R. at 62.)  Plaintiff further testified that following the stenting for her PAD, she

"ha[s] no strength in [her] right arm."  (R. at 67.)  She stated that she can no longer pop bottles

with her right hand because she "can't get enough grip."  (R. at 67-68.)

**2.      Vocational Expert Testimony**

 George Coleman, III, testified as the vocational expert (the "VE") at the hearing.  The

ALJ asked the VE to consider the following hypothetical person:

> [Someone] who can perform a range of light work [and] can occasionally climb
> ramps and stairs, can occasionally be exposed to pulmonary irritants, can frequently
> stoop, kneel, crouch, and crawl, can frequently handle with the left upper extremity,
> can never climb ladders, ropes, and scaffolds, and should avoid workplace hazards,
> such as unprotected heights or exposure to moving mechanical parts.   This
> individual cannot work in temperature extremes.   Mentally, this individual can
> perform simple, routine tasks.   They can perform production-oriented work at an
> average pace.  Can interact occasionally with co-workers, on matters limited to the

exercise of simple judgment, but work should not require interaction with the general public.

(R. at 75-76.) The VE testified that this hypothetical person could not perform Plaintiff's relevant past work. The ALJ next asked, "is there other light, unskilled work that a person of [Plaintiff's] age, education, and past work experience could perform consistent with this hypothetical?" (R. at 76-77.) The VE identified three jobs that such a person could perform, including cafeteria attendant, office helper, and carwash attendant, all of which, according to the VE, existed in significant numbers in the national economy. The ALJ questioned the VE further regarding whether these jobs would require interaction with the general public:

> Q: And just for clarity in the record, some of these jobs, like cafeteria attendant, in particular, the carwash attendant, members of the public might be around. But is it your position, based on your experience and the DOT, that interactions with the general public is not one of the requirements of the job?

> A: That is correct. The essential functions of this position, the cafeteria attendant, like for example, and the carwash attendant, interaction is not going to be an essential function more than if there is any interaction, its going to be brief and superficial, and less than occasional, because it's not in the essential functions that are described in the job description.

> Q: Okay. So even though I said no, do not require interaction with the general public, there might be some incidental interaction, but it's not required of the job.

> A: That is correct. It's not in the job description.

(R. at 77-78.) Plaintiff's counsel cross examined the VE, but not on the issue of whether and to what extent the identified jobs would require interaction with the public. (R. at 81-82.)

## C.     The ALJ's Decision

On February 8, 2017, the ALJ issued her decision. (R. at 15-31.) The ALJ first noted that Plaintiff had previously applied for benefits, which led to an Administrative Law Judge

decision dated August 20, 2012.  Noting the holding in *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), adopted by the Social Security Administration as Acquiescence Ruling 98-4(6), the ALJ recognized that she was bound by the findings of the previous Administrative Law Judge, "[u]nless the medical evidence demonstrates a change in the claimant's condition."  (R. at 15.)  The ALJ concluded that "there is new and material evidence pertaining to the unadjudicated period that changes the prior residual functional capacity," and thus declined to adopt the RFC found in the prior decision.  Nevertheless, noting an absence of good cause to reopen the prior decision, the ALJ treated the prior decision as *res judicata*, and therefore limited her focus on whether Plaintiff had been under a disability since August 21, 2012, the day after the prior decision was issued, and December 31, 2014, the date of last insured.

In conducting her analysis, at step one of the sequential evaluation process,[3] the ALJ

---

3.  Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); see also *Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

found that Plaintiff meets the insured status requirement through December 31, 2014.  The ALJ

further found that Plaintiff had not engaged in substantial gainful activity since August 21, 2012,

through the date of last insured.  (R. at 18.)  The ALJ found that Plaintiff had the severe

impairments of degenerative disc disease, coronary artery disease status post stent placement,

sinus tachycardia, diabetes, chronic obstructive pulmonary disease ("COPD"), asthma, ulnar

neuropathy of the left elbow, obesity, depression, anxiety, and posttraumatic stress disorder

("PTSD").  (*Id.*)  She further found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one or the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (R. at 19.)  At step four of the sequential process, the ALJ set

forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that, through the date of last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could never climb ladders, rope, or scaffolds; could occasionally climb ramps and stairs; could frequently stoop, kneel, crouch, and crawl; could frequently handle with the left upper extremity; could have occasional exposure to pulmonary irritants; needed to avoid all exposure to hazards such as unprotected heights or moving mechanical parts; needed to avoid extremes of temperature; was limited to performing simple, routine tasks, and could perform production-oriented work at an average pace; could interact occasionally with coworkers on matters limited to the exercise of simple judgment; and could never interact with the general public.

(R. at 21.)  Relying on the VE's testimony, the ALJ found that, through her date last insured,

Plaintiff could not perform any past relevant work, but that she could perform jobs that exist in

significant numbers in the economy.  (R. at 29.)  The ALJ therefore concluded that Plaintiff was

not disabled under Sections 216(i) and 223(d) of the Social Security Act through December 31,

2014, the date last insured.

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## IV.    ANALYSIS

Plaintiff asserts that remand is required because the ALJ (1) erred in finding that she had no severe physical impairment for right arm PAD; (2) improperly relied on her activities of daily living in finding that she is not disabled; (3) erred in failing to appropriately consider her "leg weakness and leg numbness with her leg giving out" in determining her RFC; and (4) erred in relying on the VE's testimony to conclude that there were jobs in the national economy that Plaintiff could have performed despite the limitation that Plaintiff never interact with the general public.  The undersigned finds these assertions unpersuasive.

## A.    Right Arm PAD

Plaintiff first maintains that the ALJ committed reversible error in finding that Plaintiff's PAD does not constitute a severe physical impairment.  The undersigned disagrees.

A severe impairment is defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), and which lasts or can be expected to last "for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "A severe mental impairment is 'established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a plaintiff's] statement of symptoms.'"  *Griffith v. Comm'r*, 582 F. App'x 555, 559 (6th Cir. 2014) (quoting 20 C.F.R. § 416.908).  Thus, if no signs or laboratory findings substantiate the existence of an impairment, it is appropriate to terminate the disability analysis.  *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental

10

impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .").  Significantly, "[n]o symptom or combination of symptoms by itself can constitute a medically determinable impairment."  SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996).  "[S]ymptoms" consist of a claimant's description of his or her alleged impairment."  20 C.F.R. § 404.1528(a).

At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803-04 (6th Cir. 2012).  The United States Court of Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint."  *Id*. at 863 (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985).

Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003).  Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and

considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

Here, because the ALJ found Plaintiff to have other severe impairments, her conclusion that PAD was not a severe impairment is, at most, harmless error, so long as the ALJ appropriately considered whether PAD causes Plaintiff to suffer limiting effects and accounted for any such limitations in the RFC. The undersigned concludes that the ALJ properly considered the record as a whole and reasonably concluded that Plaintiff's PAD does not cause limiting effects.

Specifically, the ALJ determined that any effects of the PAD "resolved following an angioplasty and stenting performed on September 15, 2014." (R. at 19.) The ALJ noted that "[s]ince undergoing the procedure, the claimant's physicians repeatedly observed greatly improved right arm pain and function, and [plaintiff] did not require any further treatment with her vascular surgeon prior to her date last insured." (R. at 19.) The ALJ cited various medical records in support, including a September 24, 2014, note from the physician who performed the procedure, Dr. Starr, who noted that Plaintiff was "doing well" following the procedure. (R. at 1216.) When Plaintiff visited Dr. Starr on October 16, 2014, for additional follow up, she "denie[d] any post-op problems," and Dr. Starr noted she was making "adequate progress." (R. at 1241.) In addition to the foregoing records, the ALJ gave great weight to the written evaluation of Dr. Vaccaro, a vascular surgeon who examined Plaintiff and indicated her PAD would cause no limitations on her ability to perform sustained work activity. (R. at 19.)

Plaintiff challenges the ALJ's conclusion on the basis that Plaintiff complained of headaches and memory loss, alleged effects of her PAD, following the stenting. Plaintiff points

12

to just one record during the relevant time frame to support her position, which documents an October 8, 2014, visit with Dr. Lehman. (R. at 1239-40.) Although Plaintiff complained of headaches and dizziness during this visit, a subsequent MRI revealed no stroke or other limiting effect from the stenting procedure. (R. at 1240.) More significantly, Plaintiff visited Dr. Starr roughly a week later for the specific purpose of seeing how she was doing since the stenting to treat the PAD, and Plaintiff made no complaints of headaches or dizziness. (R. at 1241.) Rather, Dr. Starr noted at that visit that Plaintiff "denie[d] any post-op problems" and that she was making "adequate progress." (*Id.*)

Plaintiff also points to an April 16, 2016 visit to Dr. Starr where she complained of dizziness, slurred speech, occasional right-hand swelling, and headaches; however, this record post-dates Plaintiff's date of last insured by nearly a year and a half. (SOE 8, citing R. 1547, ECF No. 14.) As such, the ALJ did not err in failing to find limitations based on this record. In any case, the ALJ specifically noted that Plaintiff "alleged that she suffered dizzy spells that caused her to fall," but noted an absence of corresponding evidence in the record. *See* R. at 22 (noting Plaintiff's allegations regarding dizziness, but concluding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . .".) Under these circumstances, the undersigned finds no error in the ALJ's conclusions regarding Plaintiff's PAD and the resulting RFC.

For all of these reasons, the undersigned **RECOMMENDS** that Plaintiff's first contention of error be **OVERRULED**.

**B.     Reliance on Plaintiff's Activities of Daily Living**

Plaintiff next contends that the ALJ improperly relied on Plaintiff's activities of daily living to determine that Plaintiff was not disabled.  (SOE 10, ECF No. 14.)  The undersigned disagrees.

As an initial matter, Plaintiff correctly points out that "a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).  This is because it is "well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment."  *Miller v. Comm'r of Soc. Sec.*, No. 1:07-cv-759, 2008 WL 44445190, at *4 (S.D. Ohio July 22, 2008) (citing *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992)); *see also Gabbard v. Comm'r of Soc. Sec.*, No. 3:11-cv-426, 2012 WL 5378747, at *14 (S.D. Ohio Oct. 30, 2012) ("[T]he ability to perform intermittent and interrupted daily functions such as driving, grocery shopping, or chores, is not evidence of an ability to perform substantial gainful activity." (citing *Walston v. Gardner*, 381 F.2d 586–87 (6th Cir. 1967)).

Here, however, the ALJ relied on much more than the Plaintiff's activities of daily living in determining Plaintiff was not disabled as of her date last insured.  *Walker v. Comm'r of Soc. Sec.*, No. 2:15-cv-558, 2016 WL 692548, at *50 (S.D. Ohio Feb. 22, 2016) (overruling statement of error where "the ALJ did not rely exclusively on [the plaintiff's] activities of daily living in formulating his RFC").  The ALJ based her determination primarily on a thorough examination of the medical evidence.  Moreover, Social Security Ruling 96-8p specifically mandates that

"[t]he RFC assessment must be based on *all* of the relevant evidence in the case record,"

including "[r]eports of daily activities."  SSR 96-8p (emphasis in original).  Thus, the ALJ did

not err in considering Plaintiff's activities of daily living, in addition to all the other evidence,

when determining Plaintiff's RFC.  As such, the undersigned **RECOMMENDS** that Plaintiff's

second contention of error be **OVERRULED.**

**C.     The RFC and Plaintiff's Alleged Leg Weakness and Numbness**

Plaintiff next contends that the ALJ erred in failing to properly consider her "leg

weakness and numbness with her legs giving out" in determining her RFC.  (R. at 10.)  Although

Plaintiff spends just one paragraph on this argument, she in effect maintains that her leg

weakness and numbness render her incapable of standing 6 hours per day, which is required for

her to perform light work.  (SOE 10, ECF No. 14.)  In support, Plaintiff string cites medical

records that purportedly demonstrate back problems and decreased leg strength, as well as

reported falls.  The undersigned finds no error on this issue.

The ALJ is charged with the final responsibility for determining a claimant's residual

functional capacity.  *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from

medical sources on issues such as your residual functional capacity, . . . the final responsibility

for deciding these issues is reserved to the Commissioner.").  Nevertheless, substantial evidence

must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL

3730983, at *8 (S.D. Ohio June 18, 2010).  Social Security Ruling 96-8p instructs that the ALJ's

residual functional capacity assessment must be based on all of the relevant evidence in the case

record, including factors such as medical history, medical signs and laboratory findings, the

effects of treatment, daily activities, lay evidence, recorded observations, medical source

statements, effects of symptoms, and evidence from attempts to work.  *See also* 42 U.S.C. §

423(d)(5)(B).  An ALJ is required to explain how the evidence supports the limitations that he or

she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Here, the ALJ's determination of Plaintiff's RFC with regard to alleged leg pain and

weakness is supported by substantial evidence.  The ALJ specifically considered that Plaintiff

complained of "low back pains that radiated down her left side and into her upper leg" and noted

that on September 24, 2012, Plaintiff "complained of foot pain and tingling."  (R. at 22-23.)  But

the ALJ also pointed to numerous medical records that indicate a lack of leg pain and weakness.

For example, the ALJ noted that over a period of several months in 2012, Dr. Lehman "did not

observe any difficulty walking, reduced strength, or any kind of unusual fatigue during these

visits."  (R. at 23.)  In addition, the ALJ cited Dr. Lehman's August 13, 2014 record, wherein Dr.

Lehman "did not observe any unusual gait, weakness, or fatigue."  (R. at 24.)  In addition, Dr.

Lehman's February 10, 2014 record reflects that Plaintiff had "no apparent weakness or

difficulty walking," and Dr. Anthony's April 25, 2014, record indicates Plaintiff had "normal

sensation, strength, and range of motion on both feet."  (R. at 24.)  Further, the ALJ

acknowledged that Dr. Lehman "observed some . . . lower extremity weakness on October 8,

2014," but that Dr. Lehman "did not note antalgic gait." (R. at 24-25.) The ALJ further acknowledged observations of reduced right leg sensation on June 6, 2014, but that the provider nevertheless "found full range of motion and strength in the extremities, with normal gait." (R. at 24.) Ultimately, the ALJ gave significant weight to the findings of Maria Congbalay, the state agency medical consultant, who reviewed the case on reconsideration and opined that Plaintiff retained the residual functional capacity to perform light work with the restrictions set forth in the RFC. (R. at 27.) The ALJ specifically found that Ms. Congbalay's opinion was "consistent with the record as a whole, which . . . generally reflects that [Plaintiff] presented for examinations with a normal gait, normal strength and reflexes, and no recorded episodes of syncope prior to her date last insured." (*Id.*)

Plaintiff disagrees with the ALJ, pointing to records documenting complaints of leg weakness and alleged falls. For example, Plaintiff points to a February 19, 2014 record in which she reportedly "fell over a blanket at home." (R. at 606.) Plaintiff also cites to a September 11, 2013, record that notes Plaintiff had recently "tripp[ed] over a dog." (R. at 840.) Reports that Plaintiff tripped over items at home, however, fail to establish that she suffers from disabling falling spells. Plaintiff further cites to a March 10, 2014, record that indicates "on one occasion more than a year ago, [Plaintiff] had syncope." (R. at 648.) This reference to a single episode of syncope over a year earlier likewise fails to establish that the ALJ erred, and indeed undercuts Plaintiff's hearing testimony that such episodes occur several times a day. Finally, Plaintiff points to reports of leg weakness contained at page 579 of the record, but the ALJ appropriately considered and discounted Plaintiff's complaints of leg weakness, as discussed above.

In her Reply, Plaintiff points to additional records that she asserts the ALJ failed to

consider that purportedly further demonstrate disabling falling spells due to syncope caused by a heart condition. (Reply 1-2, ECF No. 20.) Yet the ALJ considered the records at issue as well as Plaintiff's allegations regarding falls. For example, Plaintiff points to a February 12, 2014 emergency room record that documents a fall; however, the ALJ specifically referenced this record, noting Plaintiff "returned to the emergency room . . . after a trip-and-fall injury." (R. at 23.) The ALJ also acknowledged Plaintiff's complaints of "dizzy spells that caused her to fall" and "episodes of syncope two or three times per day due to her heart condition," but went on to note that the objective medical evidence failed to support these allegations. For example, the ALJ noted that Plaintiff wore a cardiology event monitor for two weeks (though she had been instructed to wear the monitor for 30 days) in or around March 10, 2014, following complaints of "nearly-daily episodes of chest pains," but that Plaintiff "experienced no unusual episodes during the monitored period." (R. at 24.) The ALJ further noted that Plaintiff "underwent placement of an implantable loop recorder and pacemaker," but that it failed to reveal any abnormalities in the months that followed, except for "a single incident of 'mild heart racing,' with no reported incidents of syncope." (*Id.*) Moreover, the ALJ noted that at Plaintiff's "last recorded cardiology examination prior to her date last insured, . . . the examining physician recorded regular heart rhythm and sounds." (R. at 25.) Thus, the undersigned finds no error in the ALJ's consideration of and conclusions regarding Plaintiff's alleged falling spells. It is **RECOMMENDED** that Plaintiff's third contention of error be **OVERRULED.**

## D.     VE's Testimony

Finally, Plaintiff maintains that the ALJ erred in relying on the VE's testimony to conclude that significant jobs exist in the economy that Plaintiff could have performed.

Specifically, Plaintiff contends that although the RFC limits Plaintiff to never interacting with the general public, the jobs the VE identified require interaction with the general public. (SOE 11, ECF No. 14.) The undersigned finds no error in this regard.

Where a VE proffers evidence at an administrative hearing in the form of expert testimony, "the Social Security Administration imposes an affirmative duty on ALJs to ask if the evidence they have provided 'conflicts with the information provided in the DOT.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (quoting SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000)). Where an unresolved conflict is identified, an ALJ is required to "elicit a reasonable explanation for the conflict before relying on the [VE's testimony as] evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 2000 WL 1898704, at *2. However, where an ALJ inquires whether the VE's testimony is consistent with the DOT and is given an affirmative response, "the ALJ [has] met [his or] her obligation under SSR 00–4p, and there [is] no error relying on the positions the VE offered." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 858 (6th Cir. 2010). Rather, the obligation to investigate the accuracy of the VE's testimony "falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT." *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) (citations omitted); *Louden v. Comm'r of Soc. Sec.*, 507 F. App'x 497, 499 (6th Cir. 2012) (holding VE's testimony constituted substantial evidence that the claimant could provide past work where the claimant's "attorney had the opportunity, but failed to cross-examine the vocational expert regarding her position that her testimony was consistent with specific provisions of the Dictionary of Occupational Titles"); *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) ("Nothing in S.S.R. 00–4p places an affirmative duty

on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct. . . . Because [the claimant's counsel] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved.").

Here, the ALJ met her burden of eliciting confirmation from the VE that his testimony was consistent with information provided in the DOT. In fact, the ALJ specifically questioned the VE as to consistency with the DOT in regards to interactions with the public:

> Q:     And just for clarity in the record, some of these jobs, like cafeteria attendant, in particular, the carwash attendant, members of the public might be around. But is it your position, based on your experience and the DOT, that interactions with the general public is not one of the requirements of the job?

> A:     That is correct. The essential functions of this position, the cafeteria attendant, like for example, and the carwash attendant, interaction is not going to be an essential function more than if there is any interaction, its going to be brief and superficial, and less than occasional, because it's not in the essential functions that are described in the job description.

> Q:     Okay. So even though I said no, do not require interaction with the general public, there might be some incidental interaction, but it's not required of the job.

> A:     That is correct. It's not in the job description.

(R. at 77-78.) Thus, the ALJ satisfied her burden. *See Kyle*, 609 F.3d at 858. Counsel for Plaintiff, on the other hand, failed to cross-examine the VE on this issue at all, despite being given the opportunity to do so. (R. at 81-82.) As such, the VE's testimony constitutes substantial evidence supporting the ALJ's determination that significant jobs existed that Plaintiff could have performed. It is therefore **RECOMMENDED** that Plaintiff's fourth contention of error be **OVERRULED**.

## V.     CONCLUSION

In sum, from a review of the record as a whole, the undersigned concludes that

substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM**

the Commissioner of Social Security's decision.

## VI.    PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, he

may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed,

appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d

981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation

omitted)).

**IT IS SO ORDERED**.

 /s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE